**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
Sheldon L. Pollock
Adam S. Grace
Travis Hill
Howard Kim
Yitzchok Klug
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
212-336-9135 (Hill)
Hilltr@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                               Plaintiff,<br><br>       -against-<br><br>SHANCHUN HUANG,<br><br>                               Defendant. | **COMPLAINT**<br><br>24 Civ. 0238<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Shanchun Huang ("Huang" or "Defendant"), alleges as follows:

**SUMMARY**

1.     Huang, the Chief Executive Officer ("CEO") of Future FinTech Group Inc.

("Future FinTech"), a Nasdaq-listed corporation, manipulated the stock price of Future FinTech

by buying hundreds of thousands of Future FinTech shares to artificially increase the company's

stock price shortly before and after he became CEO in March 2020.

2.      To induce investors to purchase Future FinTech stock, Huang sought to inflate the share price of Future FinTech to avoid the company being delisted by Nasdaq due to its failure to maintain a minimum price of $1 per share, which would have made Future FinTech stock less attractive.

3.      From in or about January 2020 through April 2020 (the "Relevant Period"), using a securities account maintained at an offshore financial institution, Huang engaged in manipulative trades of Future FinTech stock. Huang repeatedly traded at a volume so large it constituted a high percentage of the daily volume of Future FinTech stock transactions, placed multiple buy orders in short timeframes, placed limit buy orders (orders to buy the stock at a specified price or better) with escalating limit prices from one order to the next, and typically purchased Future FinTech stock at the top of the National Best Bid and Offer ("NBBO")[1] spread, trades that generally would not make economic sense for an investor who sought to buy the stock at the lowest available price.

4.      Huang's trades were intended to, and at times did, push the Future FinTech stock price upward.

5.      Additionally, upon becoming CEO of Future FinTech in March 2020, Huang repeatedly failed to make required public filings with the Commission about his beneficial ownership of Future FinTech stock and his Future FinTech stock transactions.

6.      In March 2021, after selling all of his Future FinTech stock, Huang belatedly filed an Initial Statement of Beneficial Ownership, which failed to state that Huang owned Future FinTech stock at the time he became CEO in March 2020 until his final shares were sold in

---

[1] In general terms, the National Best Bid and Offer ("NBBO") means the best bid (the highest price any buyer is willing to offer to buy the stock) and the best offer (the lowest price any seller is willing to accept for the stock). *See* 17 C.F.R. § 242.600(b)(50).

March 2021.

7.      Huang has never filed any forms with the Commission disclosing his ownership of or transactions in Future FinTech stock from January 2020 through March 2021.

## VIOLATIONS

8.      By virtue of the foregoing conduct and as alleged further herein, Defendant has violated Sections 9(a)(2), 10(b), and 16(a) of the Securities Exchange Act (the "Exchange Act") of 1934 [15 U.S.C. §§ 78i(a)(2), 78j(b), and 78p(a)] and Rules 10b-5(a), 10b-5(c), and 16a-3 thereunder [17 C.F.R.  §§ 240.10b-5(a), 240.10b-5(c), and 240.16a-3].

9.      Unless Defendant is restrained and enjoined, Defendant will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10.     The Commission brings this action pursuant to the authority conferred upon it by Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

11.     The Commission seeks a final judgment: (a) permanently enjoining Defendant from violating the federal securities laws and rules this Complaint alleges he has violated; (b) ordering Defendant to pay civil money penalties pursuant to Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (c) permanently prohibiting Defendant from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (d) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to Exchange Act Section 27 [15 U.S.C. § 78aa].

13. Defendant, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

14. Venue is proper in the Southern District of New York pursuant to Exchange Act Section 27 [15 U.S.C. § 78aa]. Among other things, Defendant is the CEO of Future FinTech, whose principal executive office is within this district; Future FinTech stock is traded on the Nasdaq exchange located within this district; and Future FinTech transacts business within this district.

## DEFENDANT

15. **Huang**, age 57, currently resides in London, United Kingdom. From March 4, 2020, to the present, he has been the CEO and a director of Future FinTech.

## OTHER RELEVANT ENTITY

16. **Future FinTech** is a Florida corporation (formerly doing business as Cyber Public Relations, Inc., and SkyPeople Fruit Juice, Inc.) with its principal executive offices in New York, New York. Future FinTech is a public issuer whose ordinary shares are traded on the Nasdaq under the symbol FTFT.

## BACKGROUND ON THE BENEFICIAL OWNERSHIP REPORTING RULE

17. Section 16(a) of the Exchange Act was motivated by a belief that "the most potent weapon against the abuse of inside information is full and prompt publicity" and a desire "to give

4

investors an idea of the purchases and sales by insiders which may in turn indicate their private opinion as to prospects of the company." H.R. Rep. 73-1383, at 13, 24 (1934).

18. Every director or officer of a company that issues any equity security registered pursuant to Section 12 of the Exchange Act is required to file with the Commission, within ten days after becoming an officer or director, a statement disclosing the amount of stock in that company that the officer or director beneficially owns. *See* 15 U.S.C. § 78p(a).

19. Subsequent statements must be filed if there is a change in stock ownership. *See* 15 U.S.C. § 78p(a)(2)(C). Such additional statements must indicate ownership by the officer or director at the date of filing and any changes in ownership since the most recent filing. *See* 15 U.S.C. § 78p(a)(3)(B).

20. Pursuant to Rule 16a-3 under the Exchange Act [17 C.F.R. § 240.16a-3], initial statements of beneficial ownership must be filed on Form 3, statements of changes in beneficial ownership must be filed on Form 4, and annual statements of changes in beneficial ownership must be filed on Form 5. *See* 56 Fed. Reg. 7265 (Feb. 21, 1991), available at https://www.govinfo.gov/content/pkg/CFR-2010-title17-vol3/pdf/CFR-2010-title17-vol3-sec240-16a-3.pdf.

**FACTS**

**I.     Background**

   **A.     Future FinTech**

21. In 1998, Future FinTech was incorporated under the name Cyber Public Relations, Inc.

22. In 2008, the company became an indirect holding company for SkyPeople Juice Group Co. Ltd. and changed its name to SkyPeople Fruit Juice, Inc. ("SkyPeople"). As

SkyPeople, the company engaged in the production and sale of fruit juices, purees, and concentrates.

23. In 2017, the company changed its name to Future FinTech Group Inc. ("Future FinTech") as part of a business transition to blockchain technology and e-commerce.

24. In or about August 2019, Future FinTech's stock price dropped below $1 per share and continued trending downward in the following months, dropping to $0.65 in early November 2019.

25. On November 4, 2019, Nasdaq notified Future FinTech that the company was not in compliance with the minimum bid price requirement under Nasdaq Rule 5550(a)(2)[2] because the closing bid price for Future FinTech's stock had fallen below $1 per share for 30 consecutive trading days.

26. Future FinTech was given 180 days to meet Nasdaq's minimum bid price requirement or face potential delisting.

27. On November 8, 2019, Future FinTech filed a Form 8-K with the Commission notifying the public of the notice it had received from Nasdaq regarding the potential delisting. The filing assured the public that "The Company intends to continue actively monitoring the bid price for its common stock between now and the expiration of the Compliance Period and will consider all available options to resolve the deficiency and regain compliance with the Minimum Bid Price Requirement."

28. On December 27, 2019, Future FinTech's stock price fell to $0.435.

---

[2] "A Company that has its Primary Equity Security listed on the Capital Market must continue to meet all of the requirements set forth in Rule 5550(a)." Nasdaq Rule 5550. Requirement (2) under Rule 5550(a) sets a minimum bid price of at least $1 per share. *See* Nasdaq Rule 5550(a)(2).

**B.     Huang**

29.    In December 2017, Huang opened several new financial accounts at a financial institution in Hong Kong, including a securities account linked to a savings account. Huang was the sole account holder on both accounts and the only person with authority over either account.

30.    For at least the four months prior to January 2020, there were no stocks traded in Huang's securities account.

31.    In or about late 2019 or early 2020, Huang was approached by Future FinTech's founder and former CEO about the possibility of Huang becoming CEO of Future FinTech.

32.    On January 13, 2020, Huang's securities account began trading one stock, Future FinTech.

33.    On March 4, 2020, Huang was named CEO and a director of Future FinTech.

34.    In ten transactions between March 23 and June 19, 2020, Huang loaned a total of $289,000 to Future FinTech to help cover Future FinTech operating expenses.

35.    Proceeds from Future FinTech stock sales funded $259,000 of the $289,000 Huang loaned to Future FinTech.

36.    On January 8, 2021, Future FinTech repaid Huang's loan.

37.    Between January 2020 and January 2021, Huang used his securities account to purchase 667,000 Future FinTech shares and sell 575,500 Future FinTech shares in approximately 390 transactions.

**II.    Huang Manipulated the Market for Future FinTech Stock**

**A.     Huang Placed Manipulative Trades from January 2020 through April 2020**

38.    Prior to January 13, 2020, Huang had never purchased any Future FinTech stock.

39.    From January 13, 2020, until Huang became CEO on March 4, 2020, Huang purchased 500,379 Future FinTech shares, with no sales.

7

40. Future FinTech's share price at the time of Huang's initial purchase on January 13, 2020, was $0.629 per share. Huang purchased 4,750 Future FinTech shares that day.

41. Future FinTech stock's closing price on January 13, 2020, was $0.65 per share.

42. Going forward, the share price of Future FinTech trended upward, closing above $1 for the first time on February 21, 2020.

43. The majority of Huang's Future FinTech stock purchases fell within the price range of $0.90 to $0.98 per share.

44. From January 13 through April 9, 2020, Huang purchased over 570,000 Future FinTech shares at a total cost of more than $520,000, placing buy orders on two-thirds of the trading days in that period.

45. Oftentimes, Huang placed multiple buy orders in short timeframes, pushing the stock price upward.

46. In addition, Huang placed limit buy orders with escalating limit prices from one order to the next.

47. Huang's buy trades were typically at the top of the NBBO spread.

48. In contrast, other market participants typically purchased Future FinTech shares in the middle of the NBBO spread.

49. On seven days in 2020 (January 27-28; February 4, 6, and 14; March 16; and April 8), Huang's purchases of Future FinTech were 26% or more of Future FinTech's daily trading volume. Paragraphs 49-72 detail four examples of such trading.

### Huang's Trading on January 27, 2020

50. On January 27, 2020, Huang's trading in Future FinTech stock constituted 42% of the reported daily trading volume.

8

51. That morning, when the Nasdaq market opened, Future FinTech stock's opening price was $0.79 per share.

52. That day, Huang placed 13 block purchase orders, ranging in size from 2,000 to 20,000 shares, for a total of 91,000 shares in a 23-minute span that dominated trading activity.

53. Many of the limit buy orders had escalating prices, as depicted below:

| DATE | TIME | ORDER QUANTITY | LIMIT BUY PRICE |
| --- | --- | --- | --- |
| 1/27/20 | 11:56 am | 2000 | 0.81 |
| 1/27/20 | 11:57 am | 3000 | 0.82 |
| 1/27/20 | 11:58 am | 5000 | 0.82 |
| 1/27/20 | 11:59 am | 2000 | 0.84 |
| 1/27/20 | 12:01 pm | 5000 | 0.84 |
| 1/27/20 | 12:01 pm | 10000 | 0.84 |
| 1/27/20 | 12:04 pm | 10000 | 0.88 |
| 1/27/20 | 12:05 pm | 10000 | 0.88 |
| 1/27/20 | 12:08 pm | 2000 | 0.9 |
| 1/27/20 | 12:10 pm | 20000 | 0.88 |
| 1/27/20 | 12:13 pm | 2000 | 0.9 |
| 1/27/20 | 12:16 pm | 10000 | 0.9 |
| 1/27/20 | 12:19 pm | 10000 | 0.9 |

54. Future FinTech stock's closing price on January 27, 2020, was $0.8398 per share.

**Huang's Trading on January 28, 2020**

55. On January 28, 2020, Huang's trading in Future FinTech stock constituted 43% of the reported daily trading volume.

56. That morning, when the Nasdaq market opened, Future FinTech stock's opening price was $0.8575 per share.

57. Shortly after 10:30 am, Huang began trading Future FinTech stock by placing a buy order for 2,000 shares with a limit price of $0.87, the top of the NBBO.

58. In less than an hour, Huang placed eight Future FinTech buy orders near the top or above the NBBO spread for 31,000 shares—five orders for 5,000 shares and three orders for 2,000 shares. With one exception, the limit prices of these orders were escalating when Huang set the limit price.

59. When Huang's last purchase order was executed at 11:46 am, his trading for the day had exceeded the volume of all other traders up to that point.

60. Future FinTech stock's closing price on January 28, 2020, was $0.85 per share.

**Huang's Trading on February 4, 2020**

61. On February 4, 2020, trading in Future FinTech stock from Huang's securities account constituted 34% of the daily trading volume.

62. That morning, when the Nasdaq market opened, Future FinTech stock's opening price was $0.87 per share.

63. Beginning at 2:46 pm, when the Future FinTech stock price was $0.8489 and the NBBO was $0.83-$0.849, several sequential orders and trades were made in Huang's securities account. The first order was for 5,000 shares at a limit price of $0.85 per share. This was followed by a series of 16 limit buy orders in just over 30 minutes.

64. The limit buy orders from Huang's securities account on February 4, 2020, had mostly escalating limit prices at or above the upper limit of the NBBO, as depicted below:

| DATE | TIME | ORDER QUANTITY | LIMIT BUY PRICE |
| --- | --- | --- | --- |
| 2/4/20 | 2:46 pm | 5000 | 0.85 |
| 2/4/20 | 2:47 pm | 5000 | 0.85 |

| | | | |
|---|---|---|---|
| 2/4/20 | 2:48 pm | 5000 | 0.87 |
| 2/4/20 | 2:50 pm | 3000 | 0.88 |
| 2/4/20 | 2:52 pm | 2000 | 0.9 |
| 2/4/20 | 3:05 pm | 3000 | 0.9 |
| 2/4/20 | 3:06 pm | 1800 | 0.9 |
| 2/4/20 | 3:07 pm | 3000 | 0.9 |
| 2/4/20 | 3:09 pm | 3000 | 0.89 |
| 2/4/20 | 3:10 pm | 3000 | 0.9 |
| 2/4/20 | 3:11 pm | 5000 | 0.91 |
| 2/4/20 | 3:11 pm | 3000 | 0.92 |
| 2/4/20 | 3:13 pm | 3000 | 0.94 |
| 2/4/20 | 3:14 pm | 1000 | 0.95 |
| 2/4/20 | 3:14 pm | 2000 | 0.95 |
| 2/4/20 | 3:15 pm | 2000 | 0.98 |
| 2/4/20 | 3:16 pm | 3000 | 0.98 |
| 2/4/20 | 3:17 pm | 1000 | 0.99 |
| 2/4/20 | 3:18 pm | 2000 | 0.97 |
| 2/4/20 | 3:25 pm | 2000 | 0.98 |

65. As a result of the trading from Huang's securities account that day, the Future FinTech market price initially rose to $0.98 and the NBBO rose to $0.9215-$0.98.

66. The Future FinTech stock price then dropped to $0.9215. At that time, three additional limit orders were placed from Huang's securities account with limit prices near or above the upper limit of the prevailing NBBO, as depicted in the three limit buy orders from 3:17 pm to 3:25 pm in the chart in paragraph 64 above.

11

67. The final purchase order of the day from Huang's securities account was made less than one minute before the market closed with a price near the top of the NBBO. Huang's final purchase order was for 2,000 shares at a price of $0.9621 per share.

68. Future FinTech stock's closing price on February 4, 2020, was $0.97 per share.

### Huang's Trading on February 6, 2020

69. The opening Future FinTech stock price on February 6, 2020, was $0.89 per share.

70. That day, the purchase of 103,000 Future FinTech shares through Huang's securities account constituted 60% of Future FinTech's reported daily trading volume.

71. Purchasing through Huang's securities account began at 9:57 am and within nine minutes, the price was up to $1.05, at which point trading stopped.

72. After the price dropped to $0.91, a series of five buy orders were placed through Huang's securities account during the last five minutes of trading, with the last execution price at $0.9799.

73. Future FinTech stock's closing price on February 6, 2020, was $0.9141 per share.

### Huang's Trading in March and April 2020

74. On March 23, 2020, Huang sold Future FinTech shares for the first time, selling 10,000 shares at a price of $1.01 per share for total proceeds of $9,946.77.

75. The same day, Huang made a $30,000 loan to Future FinTech, the first of the loans to Future FinTech alleged in paragraph 34 above.

76. On March 27, 2020, an additional 21,500 Future FinTech shares were sold from Huang's securities account at a price of $0.99 per share for total proceeds of $20,959.03.

77. On April 1, 2020, Huang purchased 10,200 Future FinTech shares at a price of $1.09 per share.

78. The opening Future FinTech stock price on April 1, 2020, was $1.05 and the closing price was $1.1281.

79. On April 8, 2020, Huang purchased 19,500 Future FinTech shares at a price of $1.22 per share.

80. The opening Future FinTech stock price on April 8, 2020, was $1.18 and the closing price was $1.20.

81. On April 9, 2020, 8,500 Future FinTech shares were purchased through Huang's securities account at a price of $1.20 per share. The settlement date for the April 9, 2020, transactions was April 14, 2020.

82. The opening Future FinTech stock price on April 9, 2020, was $1.17 and the closing price was $1.20.

83. On April 16, 2020, Future FinTech publicly filed a Form 8-K with the Commission, along with a press release announcing that, as of April 14, 2020, Future FinTech was back in compliance with Nasdaq Rule 5550(a)(2) as the Future FinTech stock price had closed above $1 per share for ten consecutive days.

84. From April 16, 2020, to January 4, 2021, Huang purchased more than 97,000 additional shares of Future FinTech and sold more than 534,000 shares through his offshore securities account.

**Huang's Offshore Securities Account is Liquidated and Closed**

85. Following an internal review of Huang's securities account for suspicious trading activity, on December 29, 2020, the offshore financial institution holding the account recommended it be closed.

86. The final Future FinTech stock trades in Huang's securities account were placed on January 4, 2021, after which the account was frozen.

87. On January 8, 2021, as alleged in paragraph 36 above, Future FinTech repaid Huang's loan.

88. In a letter to Huang dated February 8, 2021, the financial institution holding the securities account informed Huang that it was "committed to the highest standards in its controls against financial crimes" and after a "comprehensive review" of his account, they would no longer be able to provide him with banking services.

89. On March 3, 2021, Huang's offshore securities account was liquidated, including 107,497 shares of Future FinTech at a price of $5.818 per share for total proceeds of $625,435.86. The account was closed on March 10, 2021.

**B.     Huang Knew of the Future FinTech Trades and Controlled His Offshore Securities Account**

90. The location of credit card charges from Huang's two credit card accounts with the offshore financial institution and location data from the IP addresses used to access Huang's securities account and make Future FinTech trades in 2020 overwhelmingly correspond to the locations Huang moved to throughout the year.

91. At the beginning of 2020, Huang lived in the People's Republic of China ("China").

92. Huang's credit card charges and IP addresses from January 2020 appear to correspond to China.

93. In or about late January 2020, Huang left China to live in Dubai, United Arab Emirates, where he remained through August 2020.

94. Huang's credit card charges and IP addresses from February 2020 through August 2020 appear to largely correspond to Dubai.

95. With respect to Huang's securities account, another IP address from February 2020 appears to correspond to Hong Kong. Additionally, on March 27, 2020, a separate IP address appears to indicate trading from China; on April 9, 2020, a separate IP address appears to indicate trading from Hong Kong; on May 22, 2020, a separate IP address appears to indicate trading from China; and on June 16, 2020, a separate IP address appears to indicate trading from China.

96. As such, in February 2020 and the four single dates from March through June 2020, trading in Huang's securities account appears to have occurred in both Dubai and Hong Kong or China, occasionally occurring in two locations on the exact same dates (February 4, 6, and 10, 2020, and each of the four dates in March through June 2020), indicating more than one person was trading in Huang's securities account on those specific dates.

97. In or about September 2020, Huang left Dubai and began living in London, United Kingdom.

98. Huang lived in London from September 2020 through the time his securities account was liquidated in March 2021, except for a visit to Dubai in late January through mid-February 2021.

99. Beginning in September 2020 and going forward, Huang's credit card charges and IP addresses appear to correspond to London.

100. Except the transactions made from Hong Kong in February 2020 and the four single-day transactions in March, April, May, and June 2020, the location data from the IP addresses appear to indicate that the vast majority of Future FinTech trades were made from Huang's location.

101. In addition, audio recordings of telephone conversations between the financial institution holding Huang's securities account and Huang concerning banking or trading issues related to his securities account indicate Huang's control over the securities account.

102. All telephone calls were consistent with Huang's location.

103. In one call originating from Dubai, the caller was identified as Mr. Huang. Mr. Huang complained of being unable to trade for 20 days and provided the bank representative with two telephone numbers—a UAE number and a UK number.

104. Huang later stated in testimony before the Commission on April 26, 2021, that the UK number was his cell phone number.

105. In another call originating from London, the caller identified himself as Shanchun Huang and complained that he was unable to sell or buy U.S. stocks in his account. The caller also provided a credit card number matching one of Huang's credit card accounts.

106. Lastly, Huang was the sole account holder on his securities account, and proceeds in his securities account from Future FinTech stock sales were used to fund Huang's personal expenses as well as $259,000 of the $289,000 Huang loaned to Future FinTech.

### III. Huang Failed to Disclose His Ownership and Purchases of Future FinTech Stock

107. As alleged above, Huang was named CEO and a director of Future FinTech on March 4, 2020.

108. On March 4, 2020, Huang owned 500,379 shares of Future FinTech stock.

109. Huang failed to file a Form 3 disclosing his ownership of Future FinTech stock with the Commission within ten days of becoming CEO.

110. On March 3, 2021, all shares, including Future FinTech stocks, in Huang's securities account were liquidated and the account was closed.

111. On March 12, 2021, Huang belatedly filed Form 3 with the Commission, stating that he did not own any shares in Future FinTech.

112. Huang did not disclose in his Form 3 that he had owned shares in Future FinTech at the time he became CEO on March 4, 2020, up until the shares were liquidated on March 3, 2021.

113. Between March 4, 2020, and March 3, 2021, Huang purchased over 165,000 Future FinTech shares and sold more than 680,500 Future FinTech shares in more than 250 transactions.

114. Huang never filed any Form 4's or Form 5's with the Commission disclosing his numerous Future FinTech stock transactions.

**FIRST CLAIM FOR RELIEF**
**Violations of Exchange Act Section 9(a)(2)**

115. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 16 and 21 through 106.

116. Defendant, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, effected, alone or with one or more other persons, a series of transactions in a security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

117. By reason of the foregoing, Defendant directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 9(a)(2) [15 U.S.C. § 78i(a)(2)].

## SECOND CLAIM FOR RELIEF
**Violations of Exchange Act Section 10(b) and Rules 10b-5(a) and 10b-5(c) Thereunder**

118. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 16 and 21 through 106.

119. Defendant, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed a device, scheme, or artifice to defraud, or (ii) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon other persons.

120. By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)].

## THIRD CLAIM FOR RELIEF
**Violations of Exchange Act Section 16(a) and Rule 16a-3 Thereunder**

121. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 37 and 107 through 114.

122. Defendant, as the direct or indirect beneficial owner of more than ten percent of a class of equity securities (other than an exempted security) which was registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l] and/or as an officer or director of an issuer of such

securities, failed to timely and accurately file Forms 3, 4, and 5 with the Commission containing the information required therein.

123. By reason of the foregoing, Defendant violated and, unless enjoined, will again violate Exchange Act Section 16(a) [15 U.S.C. § 78p(a)] and Rule 16a-3 [17 C.F.R. § 240.16a-3] thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Defendant and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Exchange Act Sections 9(a)(2), 10(b), and 16(a) [15 U.S.C. §§ 78i(a)(2), 78j(b), and 78p(a)] and Rules 10b-5(a), 10b-5(c), and 16a-3 thereunder [17 C.F.R. §§ 240.10b-5(a), 240.10b-5(c), and 240.16a-3];

### II.

Ordering Defendant to pay civil monetary penalties under Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

### III.

Permanently prohibiting Defendant from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and

**IV.**

Granting any other and further relief this Court may deem just and proper.

**JURY DEMAND**

The Commission demands a trial by jury.

Dated: New York, New York
       January 11, 2024

    /s/ Antonia M. Apps
ANTONIA M. APPS
REGIONAL DIRECTOR
Sheldon L. Pollock
Adam S. Grace
Travis Hill
Howard Kim
Yitzchok Klug
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
212-336-9135 (Hill)
Hilltr@sec.gov